argument in the next case on the calendar, which is Securities and Exchange Commission v. Taylor. I think that's Shoreline, right? Taylor and Shoreline Holdings. Good morning, Your Honor. It's Vernon Jolly for the appellants. How are you? Very good, Your Honor. I've stood before this Court on a number of occasions, and I've reviewed both the appeal, the moving papers, and the opposition papers, and I have little to add to those papers other than to go over what was set forth in the moving papers. And I guess I'll reserve most of my argument for rebuttal. And I'm going to summarize with a statement that, in this case, the main thrust of the appeal is that this is just not the type of case that is subject to or appropriate for a summary judgment ruling. The ---- What's in dispute? Excuse me? What is in dispute? What's a material dispute? Well, the main thing that's in dispute is whether or not the fractional undivided interests were, in fact, securities that were being sold by the defendants. That's a question of law. I mean, what facts about that that would inform that decision on dispute? Well, I have to respect ---- I mean, if the ---- Yeah, respect ---- I respectfully disagree, Your Honor, that it's not a question of law based on the facts of the case. You first have to ---- I'm sorry. You have to ---- I mean, you're right. It's sort of a mixed question. And if there were facts in dispute, then we'd say you can't make the legal determination. But I don't see any facts in dispute as to that aspect of the case. We know exactly what happened, right? They bought up these fractional interests to the point where they got 80 percent of the interest, and then they were selling them to the public one at a time. Is there anything more to the facts than that? No. And according to the legal ---- So then if there are no facts in dispute, we can decide as a matter of law whether the district court was right in saying that's covered by Section 5 or not. And so ---- Based on that analysis, Your Honor, you would have to rule against in the motion for summary judgment. Because if they sold only what they purchased, it's not a violation of the securities law. We can talk about that, but that's not a question of whether summary judgment was appropriate because of dispute of facts. No, it is because ---- It's not something that you would go to trial on. If you were right on that, you'd win outright. And you have to weigh the facts to first find out whether or not they sold. But there's no dispute as to those facts. I'm sorry. Weigh the facts as to what? The authority which I cited, which, you know, is an exception to the rule, is that if you sell 100 percent of what you purchase, it's not a security. It's not a security violation. I see. You're disputing they sold them one at a time. You think they sold the 80 percent in one block? Is that a dispute? You have evidence of that in the record? Yeah. The dispute in the record is that you have to examine. The trial court was required to examine each transaction to find out whether or not that transaction violated the securities law. They did not fractionalize the interest. They did not buy the oil well. They did not do anything other than purchase in their own name a fractionalized, undivided interest in that oil well. A bunch of them. 80 of them, in fact. And the question that becomes is once they buy a bunch of these things, whether they become so that when they reissue them, they become an issuer. They sell them. Right. But why does it make a difference? They're at least an underwriter, aren't they? Let me give you an example. They're at least an underwriter, aren't they? If you're a car dealership with General Motors and you commit to buying 100 cars per year to sell, which is what they did under their contract, they said, we'll buy 75 percent, we'll buy 35 percent of what you have fractionalized, and then we own it. And then what they do with it, then you have to then analyze that under the securities laws. So if you buy 100 cars with the intent of selling each unit to the general public and you sell those units to the general public, each unit in and of itself is not a violation of the securities law. Let's say they're rare cars, and because you have to have this intent to invest in. I understand that argument perfectly well. And I don't know that I agree with it, but I understand it. What I don't understand is where are the disputed facts? I mean, we can agree with you on this. We can disagree with you on this, but there's no dispute as to what happened. Well, there is. So if you're saying, oh, something is inappropriate, we need to go to trial, I mean. The disputed facts are, Your Honor, is that we're saying that we complied with the securities law by only selling in 1 percent increments, which in some cases the record will show. Even if we accept the car dealer analogy, which, you know, the big difference between cars and fractional interest, but why isn't your client at least an underwriter? So accepting this idea that you buy 80 separate shares, just like 80 separate interests, and you can turn around and you sell them as individuals, so you're not really an issuer. Why aren't they at least an underwriter covered by Section 5? And that makes no legal difference by second thought. Well, under the authority I've cited is if you sell 100 percent of what you own, it's not a security. That's illegal. That's already been established. Underwriters sell 100 percent of what, I mean, they hope to sell 100 percent of what they own. Why aren't they an underwriter? They didn't fractionalize the interest. All they did was sell what they bought. Underwriters don't fractionalize interest. Excuse me? Do you know what an underwriter is? No, they're not the underwriter. Why aren't they underwriters? They didn't fractionalize the interest. They didn't own the oil well. They didn't divide the interest up. All they did was sell what they purchased on the market. Underwriters don't fractionalize interest. Underwriters buy fractionalized interest and then sell them in block and then sell them one by one to the public. That's what underwriters do. Why aren't they exactly an underwriter? The only way that they could violate the securities laws if they fractionalized these interests themselves and sold for something less than a 1% interest. Counsel, didn't they do just that in at least a couple of instances? They did. Okay, then why doesn't that defeat your argument? Well, because it only defeats it with regards to those transactions, and then you have other, like the safe harbors argument and the protections under that. That's why the trial court made an error. You can't, without analyzing each individual transaction to see if it was a violation of the securities law, there's no way that they could grant summary judgment. It's like it was just, hey, here it is, here's our argument by the government, and it was granted. So in your view, how many violations would be required for the court to enter summary judgment? I don't have that information before me. The safe harbors, it's like 30-plus with a million-dollar limit. There's these limits that were discussed. That was kind of a peripheral issue to the court. But there are other things that the court did not, that the court just whitewashed. Derek Gradwell had never violated, had never been under a restraining order, and he was given a third-year penalty. He'd never been before the court. He'd never done anything. It was whatever the government requested is what they got. The trial court did not analyze the transactions. They did not analyze the evidence. They never ruled on my objections to the evidence, which were in the thousands of pages. I submitted copious objections to the evidence as being hearsay. The trial court didn't even look at it. They didn't rule on it. It was a stand-up, 15-minute, you're out of here. There was no discussion. There was no analysis. There was no anything. This is not the way that a summary judgment should be granted. My clients are entitled to their day in court. They're entitled to present their evidence. They're entitled to argue that they sold only what they presented. Scalia. What would they present if they had this chance? I'm not giving you the chance. I mean, what would they present? Yeah. I bought 1 percent here. I sold 1 percent there. I bought 1 percent here. I sold 1 percent there. That's all it is. Now, if they fractionalized it, which they did in very few occasions, then that could be argued as a violation of the securities law, but then you look to the next step as to whether that's an exception. So you're disputing the contention that they bought 30 percent and then they bought 40 percent and then 30 percent, that they bought blocks of these things? No. They were under a contractual obligation to buy so much in blocks, but they were only sold individual 1 percent units, and if they could not buy the entire block, then they would only be charged per 1 percent unit. So they were purchasing 1 percent interest one after another in these oil ventures, and then they would turn around and sell them. I don't understand what you're saying. They had a contract to buy it. How much? Well, there were four or five different projects, and that's one of the arguments we have is that the SEC and the Court lumped everything together to get this aggregate amount of $3 million. There were four to six projects, and they were different ventures, different people, different individuals. That was another error that the Court did. You have to look at each venture on its own to see if it complies with the securities laws or if it's a violation of the securities laws. And each of those ventures involved a number of these names? Different ones, yes. You could see that? Obviously, yes. Each venture had a different contract. I'm at a loss. How does that square with, oh, they bought one here and they bought one there? If they had, what, four contracts, six contracts at the most? Well, let me go back to the car dealership. I have six car dealerships. Each car dealership has a different contractual obligation with General Motors to purchase so many cars per year. If they don't purchase, General Motors can say, well, if you don't purchase, we're still going to assess you this much money per car. You're still going to purchase this much money per car. And that's what they did. They were given, they were under a contract with the operator who fractionalized the interest. They had a contract to buy that many interests. They didn't have to. I mean, it's like the operator gave them a way out. They're saying, well, you're not in breach of contract if you don't buy 75% or if you don't buy 10%. But we will then charge you this much per 1% working interest in our venture. And that's what it was about. Their argument is, hey, we took what we bought and we sold it as we bought it. The SEC's argument is they bought a block, 75%, which calculated out is $3.1 or $3.6 million in six ventures with different operators. And therefore, they violate the securities laws. And that's not the way the case is analyzed, and that's not the way it should be. You're having a difficult understanding where your disputed facts are. Now, we might look at these facts and disagree with the district court about whether this was or was not, whether they bought, whether this amounts to securities violation. But where's the dispute? Where's the factual dispute? The real dispute is the SEC. Where is all this evidence that the district court ignored? The SEC. It sounds to me like your facts are pretty much like the SEC's. No. The SEC does not agree with my presentation of the facts. That's why we're here. If they agreed with it, then you'd have to go along with my line of case authority and rule accordingly. Your three minutes are over. Let me give the SEC a chance to finish. Thank you, Your Honor. Good morning. My name is Mark Pennington. I represent the Securities and Exchange Commission. They bought blocks of interest. And the example we use in the brief, you can find on page 484 of the defendant's execution. You're not going to use the car deal example, I gather. I'm not, Your Honor. But they would be an underwriter. The contract that they entered into with the owner or the operator gave them time to pay for up to 25 percent on the first transaction, up to 25 percent in interest. And the contract says, unambiguously, at the end of the time that's set, if you've paid for it all, we'll convey to you 25 percent. We're not going to convey you to 1 percent or 2 percent. We're going to convey you 25 percent. If you've paid less than 25 percent, then we have two choices. That is, the operator has two choices. We can take the money that you've given us and we'll convey that percentage to you. Not in 1 percent increments. We'll just give you that percentage. There'd be no reason for an operator to be conveying in 1 percent units. They weren't selling to these people. They were trying to unload as much of the deal as possible onto these people in a block. Alternatively, we'll give you 30 more days and you can try to come up with some more money. But that's the unambiguous contract provision, and each contract is similar. You can buy a chunk, and the operator said, we didn't know what they were going to do with it. It was possible they were going to sell it. That's provided for in the agreement. But we didn't know what they were going to do with it. And then the defendants turn around and they use cold calling techniques to sell this stuff out the door. People that they've called up off their cold calling list. And that's where the interests are then split, the 25 percent. Of course, it had to be sold in percentage interest. I mean, how else can you buy things? It was either fractions or percentages. But the anticipation between the operators and the defendants was that the defendants would receive these blocks. And then they could do what they wanted with them. And what they did was they turned around and split it into 1 percent increments or in sometimes smaller than 1 percent increments, and they sold it. And that is exactly, precisely the type of speculative selling of interest in oil and gas properties that Congress was concerned about in 1934, when they added the definition of the fractionalized undivided interest in oil and gas to the 1933 Securities Act. And that is, I think, in essence, that's the case, because I agree that the principal issue is whether it's a security. And I think that there can be no doubt about that. I don't know if there are questions at this point. I thought there were disputed questions, in fact, on the fraud. I mean, you have – I mean, it's – I mean, the fraud, as I understand it, is that they – That's right. I find it a little hard to believe, because people realize that there are sales commissions in these things. And, you know, they're very high here. I mean, there's, what, 30 percent markup. But it seemed to me it was not at all undisputed that there were – I mean, and I guess if the guy says, look, there are no sales commissions here, which I don't think he said, if he said, look, you know, every – you know, we're getting paid by somebody else, every penny of this goes into the venture, that would be fraud. But I don't think it's nearly as clear-cut as all that. And it seems to turn on dispute about whether he said 100 percent of the dollars go in or 100 percent of the available dollars go in, you know. Well, let me stop you, Your Honor. The language that we think is sort of a key, and then everything else builds around that, is in the offering documents, in the sales brochures that they sent out, it said, we're soliciting you to be a participant. They say, working interest owners, and then there's parentheses, participant, are going to be investing. So that's the investor is the participant. And this is the language that we think is really the smoking gun. All purchase of interest proceeds will be paid to the operator, either in payment of leasehold costs, the management fee, or as a prepayment for the drilling, testing, and completion of the project. May I have a citation for that in the excerpt, please? Yes, DER 1109. It's also quoted on page 11 of our brief. 1109. Hold on a sec. I have a much easier time following these things along. 1102, 1106, 1108, 1109. I am with you. Do you have that page in front of you? Tell me where you're reading from. Okay, it's paragraph 5, 6, 7, and 8. Paragraph 5. It's the last sentence in paragraph 5. Go ahead. Paragraph 5 actually consists of two paragraphs. Right. I believe it's the last sentence of the second paragraph, paragraph 5. All purchase of interest proceeds will be paid to. No, it's the first, last sentence of the first paragraph. I'm looking at my brief. All purchase of interest proceeds will be paid to the operator, either in payment of leasehold costs, the management fee, or as a prepayment for the dwelling testing. All purchase of interest proceeds. And you read all purchase of interest proceeds as meaning everything you, the buyer, paid. Right, because they're always told, and as I say, this is like the. I mean, it's entirely possible to say that the purchase interest proceeds are everything that of the commission. Well. I don't know. Well, if you look at the whole description of the page 1108 and 1109, which is the description, it begins by saying prospectus purchasers of fractional undivided working interest. And that's the way it talks about them. And then it says the payment by a non-operating working interest owner defined as a participant will be sufficient to pay his share of the cost of the leases, the management fee, and drilling and completion of project wells. 1108, paragraph one. So that's what sets that up. And then they're told. So both implicitly and also expressly, they're told the money that you're paying is to buy interest in these wells. And the cost of the interest in the wells is calculated based on the cost of drilling the wells. And then you have them saying explicitly all the money is going to go into drilling wells. And it's all going to go to the operators. And the operators think that the money you're paying is going to be enough to pay for drilling the wells. And that's how it's calculated. And it's a turnkey contract. If it turns out that it's not enough, then the operator is going to eat the difference. And this is the way the whole thing is pitched. And we have a couple of pages in our brief around page 11 where we kind of put together the different language. But the language that I've quoted, to me, is unambiguous. All purchase of interest proceeds. Because these people are only told that all of their money is purchasing interest. They're not told two-thirds of your money is purchasing interest and a third goes to us. And if you wanted to find an ambiguity, then you'd remember that the rule and the statute, the anti-fraud rule. What if the commission were 3 percent or 5 percent and everything else were the same or the markup? Right. You know, we call it markup or commission. Right. You know, whatever you want to call it. Still be a fraud. The discouragement would be smaller because they thought they wouldn't bother with it. It's more like I'm serious. Something more likely that they wouldn't bother with it. I mean, as a practical matter. But it would still be illegal. It would still be a fraud. I see. I remember. So in your view, the I mean, if it's a little difficult to say 30 percent of the fraud, but 3 percent is not a fraud. I don't say that. I say if you tell somebody you think it's basically a question of enforcement discretion. Right. If you tell somebody you're going to put all your money in a well and you don't, then you've committed fraud. If it was a material misrepresentation, I guess it could be so small you say, well, that's not a material misrepresentation. But remember, the statute and the rules. I see. If it were 0.1 percent, you'd say it's immaterial. It would be an argument. I mean, you could be a court or the commission might decide that's not a material misrepresentation. The rule and the statute both prohibit false statements and also the failure to disclose information necessary to make the information that is disclosed not misleading. And if you say to someone, all through the sales field, all through your documents, all the money you're giving us is going into wells, except we're going to keep some of it, you've not only affirmatively misled them, but you've failed to eliminate the problem by making the necessary. Counsel, you're running out of time. Could I ask you to address Polson Counsel's observation that his objections were not ruled upon by the district court? It's true they weren't ruled upon. They weren't really fleshed out. They weren't fleshed out in their brief here. Almost all the documents were either from the defendants or they were authenticated by the victims. I mean, these are documents that came to a large extent from victims. In the record, there are affidavits from the victims saying this is what I got in the mail from these people and this is what they told me. And there's a transcript of a sales pitch that that was taken by the FBI and that's authenticated. The cold call materials were seized by the FBI and turned over to the receiver. So there are business records that were turned over that way. And I don't think that any of the documents were authenticated and they weren't hearsay in the sense that they all come from the defendants, they're all statements of the defendants that are authenticated by the victims, not all of them, but almost all of them. The only place I know that there's any sort of relevance about these objections, it's true the judge didn't rule on them. I don't know whether he thought the arguments weren't developed or they were so ill taken or what. I can't tell you. Some of the material that we cited showed that they were using a general solicitation and, therefore, they couldn't get some of the exemptions they were relying on. That was authenticated by the receiver. Also, if you read the transcript from the affidavits of the cold calls, the sales pitches, you can tell that's what's happening. They're calling up people they don't know and they're offering to sell them things. But procedurally, are we allowed to disregard the fact that these objections were not ruled upon? Well, if they're discretionary calls, and if you could show a prejudice from the failure to rule on them, then I think you would send it back to the district judge. But I don't think they're discretionary calls. The arguments aren't developed, so you can't tell what they're saying. And they don't claim any prejudice. I mean, they don't claim these are inauthentic documents. And they don't point to the ones that make any difference. And they don't challenge the affidavits. They don't challenge the sales contracts that are all on the record, I don't believe. And I would point out, with respect to the exemptions, that they have the burden of proving that they qualify for the exemptions. So even if you throw out all of our evidence, they haven't proven that they fit into the exemptions, because they didn't offer any evidence. They took the fit. Then Mr. Gradwell filed an affidavit, but he doesn't say anything about the sales practices. Did we sell to, you know, whoever would buy? Did we engage in general solicitation? He doesn't say anything about that. So he's failed to fit himself into the exemptions just by standing mute. So I guess my short answer to your question is the arguments are not developed. They were authenticating documents. They're not hearsay because of the defendant's documents. And the undisputed evidence carries the case. And there's no prejudice shown, which is not a short answer to your question. But that's my answer. Okay. Thank you. I'll give you all the time. I'll give you a minute for a bottle. Thank you, Your Honor. None of the documents were addressed by the court. The only thing that could be. What's the beef? The beef is, is that they were all hearsay other than the declarations by a few individuals. What they were analyzed and assessed, and I'm going to use up all my time here, they were analyzed and assessed by the SEC and told to the court what they believed happened in this case. The documents dealt with many defendants, not just my clients. Okay. And what they're saying is that there were cold calls made, there were this. They had documents, but nobody testified as to what those documents were. Nobody authenticated those documents as being produced by my clients, as being even relied on by my clients. Are your clients disputing those cold calls? Yes. Yes. There were some cold calls, but my clients will testify if allowed to a trial that they were calling mostly people that they had talked to in the past, that they had customers. In the past, they called their customers. These were individuals that had operated in other business entities. So the cold call thing is just speculation. So there were some cold calls. I don't even know that. We never got to that. It's what the SEC contends. And as I stand here today, I would have to say logically there might have been cold calls. Let's say there are others that were customers. What difference does that make? If they were prior, if they were people that were getting off track, and sincerely and respectfully, Your Honor. You raised it. If you don't want to talk about it, that's okay. Yeah. You said, no, there were cold calls. They were customers. Yeah. So now I don't know why that matters. Actually, you could explain. No, it matters. I don't have to go there. It matters because it's one of the elements under the violation of the SEC laws. If they engage in that type of conduct. And it goes to whether or not they then exceeded the limits under the safe harbors rule. And so, yeah, it does make a difference. But how many cold calls did they make? What did they do? Who did they contact? Was this individual a cold call? That's the entire problem with this case on a motion for summary judgment. Did your clients put in contra affidavits? There was, yes, an affidavit. And the judge said it was entirely conclusionary. And probably the last third of my brief is explaining why it's not conclusionary. There was no deference or anything given to my client's affidavit, his declaration. I'm trying to explain what he did. He bought. He sold. On the cold call issue or the customer issue, what did he say about that? I can't respond to that because I can't recall if that was addressed in his brief. Do you want to grab the excerpts? Excuse me? Do you want to grab the excerpts of the record and look? All I have are the briefs today. Because of the passage of time, we did locate all of the excerpts. But I analyzed his declaration. I can go through it. It's page 33 to probably 45. The. I'm sorry, page 33 of what? Excuse me? I'm sorry, where is the declaration? I've quoted in my brief pretty much every paragraph of his declaration and then explained to the court why that is not conclusionary, as the trial court stated. I asked a specific issue on this business about the cold calls. What's in it? What's in the. The cold call is a non-issue. Is that addressed in the declaration? The cold call is a non-issue until they exceed the limitations under the safe harbors. May I ask you a question? Yes. Are the cold calls addressed in the declaration? I don't believe it is. Okay. I can't recall that. I'd have to read the declaration. So you're not claiming that you created a triable issue of fact on this by putting counter declaration? I don't know if I understand that question. Am I contending that there's a triable. The way it works in summary judgment is they put in evidence. And then if you want to say there's a disputed issue of fact on this, you put in counter evidence. And then a trial judge says, has to look at it and says, look, we've got disputed facts here. One side is saying X. The other side is saying not X or Y or something else. And so we need a trial. We can't resolve it. If only one side puts in evidence on one point, then you don't have a disputed issue of fact. And I'm asking you whether you put in a disputed, whether you put in. I don't think that was an issue in the papers. That was not something I addressed, as I recall. I need one. That's all I need. I need a triable issue of fact to proceed a trial. Just because, let's say he made entirely cold calls. Does that mean that every other thing that was not ruled on by the Court is now disputed, undisputed? What does one established fact that the SEC presents have to do with all of the other understaffed facts? Depending on what that fact is, it may end with other facts that are relevant. But cold call doesn't, is not a material issue. So you're not really disputing that there were cold calls? No, there were. I would not even today dispute that if they made cold calls, that means one thing or the other. Okay. Because what is important is how many cold calls. And did they make calls to other clients that they had, which is, the answer is yes, people that they had on their list before. So the cold call is not a real, it's not an issue. Okay. Thank you. Thank you. Patients, are you sentiments?
judges: Canby, Kozinski, Rawlinson